# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

ADSYNC TECHNOLOGIES, INC.       )
                                     )

    Petitioner                )

                                     )     No. 25-1148

    v.                         )

                                   )

FEDERAL AVIATION ADMINISTRATION    )

                                   )

    Respondent              )

_____ )

## PETITION FOR REVIEW

Adsync Technologies, Inc. ("Adsync"), pursuant to 49 U.S.C. § 46110 and 14 C.F.R. § 17.43, hereby petitions this Court for review of the Order of the Federal Aviation Administration ("FAA"), FAA Order Number ODRA-25-966 ("Order"), entered on April 24, 2025 (attached hereto as Ex. A), adopting the Findings and Recommendations of the Office of Dispute Resolution for Acquisition ("ODRA"), in ODRA Docket No. 24-ODRA-00969 (attached hereto as Ex. B).  That Order denied Adsync's protest challenging the award of a contract under Screening Information Request No. 693KA8-23-R-00014 to Adacel Systems, Inc. for the provision of hardware, maintenance, and system support for the Tower Simulator System used to train air traffic controllers, following

corrective action ordered under FAA Order No. ODRA-24-955 in a prior

protest by Adsync regarding the same award, ODRA Docket No. 23-

ODRA-00951.

The Order is unlawful because it is arbitrary, capricious, an abuse

of discretion, and otherwise contrary to law in its conclusions that the

contract "Product Team's evaluations conformed to the solicitation, the

Acquisition Management System, and the prior order" (*i.e.*, FAA Order

No. ODRA-24-955) and that the "Source Selection Official's best value

and award decision had a rational basis." (Order at 1.) Accordingly,

Adsync requests that this Court hold the Order unlawful and set aside,

modify, or amend it, and/or remand to the agency for further

proceedings.

Date: June 20, 2025

/s/ Paul A. Allulis
Samuel Finnerty, Esq.
Paul A. Allulis, Esq.
**PILIEROMAZZA PLLC**
1001 G Street NW
Suite 1100
Washington, D.C. 20001
Telephone: (202) 857-1000
Facsimile: (202) 857-0200
*sfinnerty@pilieromazza.com*
*pallulis@pilieromazza.com*

*Counsel for Adsync Technologies, Inc.*

UNITED STATES DEPARTMENT OF TRANSPORTATION

# FEDERAL AVIATION ADMINISTRATION

**WASHINGTON, DC**

# ORDER

| | |
|---|---|
| **FAA Order Number:** | **ODRA-25-966** |
| **Matter:** | **Protest of Adsync Technologies, Inc. Under Solicitation No. 693KA8-23-R-00014** |
| **Docket:** | **24-ODRA-00969** |
| **Date Served:** | **April 24, 2025** |

## ORDER

Adsync Technologies, Inc. (Adsync) protests the award of a contract to Adacel Systems, Inc. The contract provides hardware, maintenance, and system support for the Tower Simulator System used to train air traffic controllers. The award follows corrective action ordered under FAA Order No. ODRA-24-955 in a prior Adacel protest docketed as 23-ODRA-00951.

The Office of Dispute Resolution for Acquisition (ODRA) adjudicated this second protest and provided the attached Findings and Recommendations. Although Adsync challenged the evaluation of the technical, management, and price proposals, ODRA found that the Product Team's evaluations conformed to the solicitation, the Acquisition Management System, and the prior order. Similarly, ODRA found that the Source Selection Official's best value determination and award decision had a rational basis. ODRA recommended that the protest be denied in its entirety.

I adopt and incorporate ODRA's Findings and Recommendations into this order. For reasons stated therein, I deny the protest in its entirety.

This is the final agency order in this matter. To the extent that this decision is subject to review, such review shall be sought under 49 U.S.C. § 46110 and the ODRA Procedural Rule, 14 CFR § 17.43 (2025), within sixty (60) days of issuance of this order.

*Christopher J. Rocheleau*

Christopher J. Rocheleau

Acting Administrator
Federal Aviation Administration

Issued on 4/24, 2025.

**UNITED STATES DEPARTMENT OF TRANSPORTATION**
**FEDERAL AVIATION ADMINISTRATION**
**OFFICE OF DISPUTE RESOLUTION FOR ACQUISITION**

---

| | |
|---|---|
| Protest of )| |
| ) | |
| Adsync Technologies, Inc. ) | Docket No. 24-ODRA-00969 |
| ) | |
| <u>Pursuant to Solicitation No. 693KA8-23-R-00014</u>) | |

*Appearances:*

| | |
|---|---|
| FOR PROTESTER: | Samuel S. Finnerty, Esq.; Katherine B. Burrows, Esq.; Jacquelin K. Unger, Esq.; Eric Valle, Esq.; and Daniel J. Figuenick III, Esq., of PilieroMazza PLLC |
| FOR INTERVENOR: | Noah B. Bleicher, Esq.; Jennifer Eve Retener, Esq.; Ginsey V. Kramarczyk, Esq.; Andrew L. Balland, Esq., and Sierra A. Paskins, Esq., of Jenner & Block LLP |
| FOR FAA PRODUCT TEAM: | Inna Pokrovnichka, Esq.; and Paul J. Blenz, Jr., Esq. |

## FINDINGS AND RECOMMENDATIONS

Protester Adsync Technologies, Inc. (Adsync) challenges the award of a contract to Adacel Systems, Inc. (Adacel), which has intervened in the protest. The protest arises out of corrective actions ordered by the Administrator in a prior protest.[1] Briefly stated, the Administrator previously found that the Product Team gave Adacel a competitive advantage through unequal access to information. The order gave Adsync the limited opportunity to revise its proposal and required the Product Team to reevaluate the proposals. Adsync now challenges the reevaluation and award. It raises many issues pertaining to the price evaluation, the technical evaluation, and the best value trade-off. The Office of Dispute Resolution for Acquisition (ODRA) recommends that the Administrator deny the protest.

---

[1] *See Protest of Adsync Technologies, Inc.,* 24-ODRA-00951. Familiarity with the decision is presumed. The public version of the Findings and Recommendations, along with the Administrator's Final Order, are published on the ODRA website, www.faa.gov/go/ODRA.

**PUBLIC VERSION**

## I. STANDARD OF REVIEW

As the party seeking relief, a protester bears the burden of proof and must demonstrate by the preponderance of the evidence that the challenged decision lacks a rational basis; is arbitrary, capricious, or an abuse of discretion; or is inconsistent with the Acquisition Management System (AMS) or the underlying solicitation.[2]

## II. BACKGROUND

When Adsync filed the initial protest, it was the FAA's incumbent contractor supporting the Tower Simulator System (TSS) used to train air traffic controllers. At the time, the TSS used old hardware running outdated versions of MaxSim, a proprietary software product from Adacel. At the heart of the prior protest, the Product Team disclosed to Adacel—but not Adsync—that new versions of MaxSim would run on the new TSS hardware supported by the contractor under the current solicitation. This disparity created a material, organizational conflict of interest (OCI) under the principle of unequal access to information. The Administrator adopted the ODRA's recommendation to give Adsync—but not Adacel—the opportunity to revise any aspect of the proposal affected by the OCI.

In accordance with the details of the ordered remedy, the Product Team appointed a new Source Selection Official (SSO),[3] reconstituted the Technical Evaluation Team (TET) from the available evaluators,[4] established a Price Evaluation Team (PET) consisting of the contracting officer (CO) and one other individual,[5] and gave Adsync the opportunity to revise its proposal.[6] Adsync responded with a revised proposal that included revisions to Volume II (Management), Volume III (Technical), and Volume IV (Pricing).[7]

Section L of the Solicitation required that proposals be placed in six volumes corresponding to the evaluations conducted under Section M:

- Volume I: Offer and Other Documents;
- Volume II: Management;
- Volume III: Technical;
- Volume IV: Past Technical Performance;

---

[2] 14 CFR. § 17.21(m) (2025).

[3] Agency Response (AR) Attach. 24, CO Decl. at 3, ¶ 15.

[4] Two members of the original TET were not available. AR Attach. 25, TET Leader Decl. at 1, ¶ 4.

[5] AR Attach. 24, CO Decl. at 3, ¶ 18.

[6] AR Attach. 4.

[7] AR Attach. 24, CO Decl. at 3, ¶ 17.

- Volume V: Pricing; and,
- Volume VI: Small Business Contracting Plan.[8]

As reported in the Source Selection Decision Memorandum, the SSO awarded the contract to Adacel based on the following evaluation results:[9]

| Offeror | Vol. II: Management | Vol. III: Technical | Vol. IV: Past Performance | Vol. V: Price |
|---|---|---|---|---|
| Adacel | Good* | Good | Satisfactory Confidence | $52,495,797.85 |
| Async | Good | Good | Substantial Confidence | $53,127,917* |

The asterisked items are of particular interest. As Adsync notes, Adacel was not permitted to revise its proposal, but its overall rating for Volume II raised from a mere *Satisfactory* to a *Good*.[10] Further, Adsync's revised price was $52,393,220.12, but the PET raised the evaluated price by 1.2% to the figure shown in the table.[11] In light of these results, the SSO rendered an award decision in favor of Adacel.

Adsync filed this Protest after receiving a written, post-award debriefing.[12]

## III. DISCUSSION

Adsync challenges the technical evaluation, the price evaluation, the best value determination, and compliance with the Administrator's order in the prior protest. In making these arguments, the 67-page protest repeats the same factual issues or charges time after time. Although the organization of these Findings and Recommendations does not mirror the arrangement of the Protest, ODRA has thoroughly considered all issues raised.

### A. ODRA finds no errors in the evaluation of Volumes II and III.

Adsync challenges the adjectival ratings it received for Volume II, Factor 1, and Volume III, Factors 1 and 3. It claims it deserved *Excellent* ratings rather than merely *Good* ratings.[13] Adsync argues that the Product Team failed to adequately

---

[8] AR Attach. 1 (Solicitation) at §§ L.9 and M.6. Notably, the Solicitation required only large businesses to submit the subcontracting plan in Volume VI. Neither Adacel nor Adsync submitted Volume VI.

[9] AR Attach. 15 at 3-4.

[10] Protest at 13.

[11] *Id.* at 6.

[12] Protest at 4; AR at 9.

[13] Protest at 20.

EXHIBIT B

explain why it changed its ratings, failed to award justifiable strengths, and engaged in disparate treatment. After discussing each of these theories—collectively for the volumes at issue—ODRA examines the adjectival ratings themselves and finds no basis to sustain the protest regarding the TET's evaluation.

### 1. Neither the AMS nor the prior order obligated the Product Team to explain changes in ratings.

As a general proposition, Adsync claims the evaluators acted improperly by not explaining why their current evaluations of strengths and weaknesses differed from the prior evaluation.[14] It relies heavily on the Government Accountability Office (GAO) decision in *EAlliant, LLC.* That decision recognized that the primary question always is whether the evaluation is consistent with the solicitation, regulations, and statutes, and further, whether the rationale is documented.[15] GAO in *EAlliant* stated that "this general principle has limitations where the same source selection official reviews conclusions by different evaluators." But *EAlliant* is distinguishable inasmuch as a new SSO rendered the award decision as the Administrator directed. Moreover, the composition of the technical evaluation team changed.[16] Neither the AMS nor the Administrator's reevaluation order requires comparative explanations of changes or decisions *not* to award strengths.[17] ODRA will not impose such a requirement after the fact. It recommends that this ground of protest be denied.

### 2. Adsync has not shown it deserves additional strengths for Volumes II and III of its proposal.

Adsync challenges the results of three evaluation factors. Among other issues, it argues that 15 strengths from the first evaluation should be restored.[18] Adsync relies heavily on its argument that the TET failed to explain why it did not award the strengths, but ODRA has already stated above that the TET was not obligated to explain changes. Its protest does not justify the alleged strengths in any detail, but the Product Team responded with a declaration from the TET Leader that addresses each allegation. In turn, Adsync's Comments on the Agency Response

---

[14] *Id.* at 17.

[15] *EAlliant*, LLC, B-407332.6 (Jan. 14, 2015).

[16] A change in the TET members in and of itself is a valid reason to reevaluate both offerors' proposals because it ensures that the proposals are measured against the same understanding of the solicitation and evaluation criteria.

[17] *Accord Tech Marine Business, Inc.*, B-420872, Oct. 14, 2022 ("an agency's contemporaneous evaluation record is not required to 'prove a negative,' or document determinations of adequacy").

[18] Protest at 21–23, 29–31, 35–37.

EXHIBIT B

generally attacks the declaration as *post hoc* and addresses the conclusions by discussing the features described in Adsync's proposal.[19]

ODRA is not impressed by Adsync's repeated criticism of the TET Leader's declaration simply because it is *post hoc*. "The ODRA … is not precluded from considering post-protest explanations that provide a detailed rationale for the contemporaneous conclusions as such explanations can simply fill in previously unrecorded details."[20] Notably, in this unique context of addressing strengths *not* awarded, declarations become more appropriate (and perhaps necessary) because the ODRA ordinarily would not expect the contemporaneous documentation to address strengths or weaknesses that were *not* recognized.

Turning to the evaluators' conclusions, ODRA is mindful of its relatively circumspect review of such issues. "[T]he evaluation of proposals is 'inherently a judgmental process which cannot accommodate itself to absolutes,' and the TET has broad discretion in evaluating proposals, provided that their conclusions are rational, consistent with the SIR, and supported by substantial evidence."[21] Here, the TET Leader explained that the overarching reason for not assigning the strengths lies in the definition of a strength, which requires a representation in the proposal to "exceed" the solicitation requirements.[22] He elaborated that the TET believed that ODRA's previous findings regarding failure to adequately document the rationale compelled the TET to recognize only well-documented strengths.[23] He then addressed each allegedly missing strength.

ODRA has reviewed each allegation but finds no error in assigning strengths. For example, Adsync seeks to restore a strength previously awarded under Volume II, Factor 1, that recognized "Adsync's ability to integrate modified or new software systems and hardware components into the TSS."[24] The TET Leader explained that the processes and facilities described in Adsync's proposal (at Vol. II, page II-2-13) demonstrated the ability to comply with the test-bed requirements found in § 3.5.2.9

---

[19] *See, e.g.*, Protest at 19, 26, 27, and 37.

[20] *Concur Technologies, Inc.*, 14-ODRA-00708 (Findings and Recommendations (Pub. Ver.) slip op. at 26, n.8).

[21] *Protest of Ahtna Facilities Services, Inc.*, 12-ODRA-00615 (Findings and Recommendations (Pub. Ver.) slip op. at 44) (quoting *Protest of Information Systems & Networks Corporation*, 99-ODRA-00116; citing *Washington Consulting Group Inc.*, 97-ODRA-00059).

[22] AR Attach. 25, TET Leader Decl. at 2–5, ¶¶ 7–21. *See also* AR Attach. 1 (Solicitation) at § M.7.3 (defining a "strength" as "An element of an Offeror's proposal which exceeds requirements and provides an especially good, innovative, or unique feature, or which provides value and benefit to the Government, such as improved performance").

[23] AR Attach. 25, TET Leader Decl. at 1–2, ¶ 6.

[24] Protest at 23.

of the statement of work (SOW), but the TET saw no clear evidence that it exceeded FAA's needs.[25]  In response, Adsync's Comments restate the information provided by the proposal, supported only by views from counsel that describe the capabilities as "impressive" and "exceed requirements."[26]  But this approach cannot win the day.  First, Adsync does not show that the TET failed to consider relevant information.[27]  Second, the technical views of counsel are of little value when attempting to impeach the opinions of technical evaluators.[28]  Third, mere disagreement is not sufficient grounds to sustain a protest.[29]  For these reasons, ODRA recommends denying this specific issue. More broadly, these conclusions apply to the other 14 claimed strengths, which should also be rejected.[30]

### 3.  The evaluation and award are not tainted by disparate treatment.

Adsync claims four instances of disparate treatment.  Disparate treatment "occurs when an evaluation team judges offers by demonstrably different standards in a materially and prejudicially different manner."[31]  But disparate treatment cannot be shown when there are "meaningful distinctions between the proposals."[32] ODRA finds that the Product Team identified meaningful distinctions between the proposals that render this protest issue unsustainable.

Three of the allegations concern strengths awarded to Adacel under Volume 1,[33] which the SSO relied upon to determine that Adacel's Volume I deserved a *Good* rating.[34]  ODRA finds that meaningful distinctions between the proposals provide a rational basis for these determinations:

---

[25] AR Attach. 25, TET Leader Decl. at 4, ¶ 16.

[26] Adsync Comments at 26–27.

[27] *See, e.g., Protest of Spatial Front, Inc.*, 17-ODRA-00803 (Findings and Recommendations (Pub. Ver.) slip op. at 9 ("Successful protests of the failure to award strengths commonly rely on disparate treatment theories or on failure-to-consider arguments.") (citing *Enterprise Engineering Services, LLC*, 09-ODRA-00490).

[28] *Protest of Frequentis USA, Inc.*, 19-ODRA-00866 (Findings and Recommendations (Pub. Ver.) slip op. at 7) (citing *Protest of Zolon Tech Inc.*, 19-ODRA-00854).

[29] *See, e.g., Protest of US Aviation Group LLC*, 20-ODRA-00881 (Findings and Recommendations (Pub. Ver.) slip op. at 11).

[30] ODRA has fully considered the other alleged strengths, but further discussion is unnecessary and would only belabor the analysis.

[31] *Protest of Apptis, Inc.,* 10-ODRA-00535 (Findings and Recommendations (Pub. Ver.) slip op. at 79) (citing *Protest of Enterprise Engineering Services, LLC*, 09-ODRA-00490).

[32] *Protest of Apptis, Inc.,* 10-ODRA-00535 (Findings and Recommendations (Pub. Ver.) slip op. at 81.)

[33] Protest at 26–27.

[34] Protest Ex. K at 10 (the debrief excerpt); AR Attach. 15 (Source Selection Decision Memorandum).

6

**PUBLIC VERSION**

- <u>Communications</u>.  The TET awarded Adacel a strength because its proposal exceeded the requirements in SOW § 3.2.1 by adding a direct line of communication from the FAA to Adacel's Chief Executive Officer.[35]  The SSO concurred that this was a benefit that justified a Good rating for Volume II.[36]  While Adsync argues that its proposal had a strong communications plan, it does not demonstrate that its proposal also included a line of communication with its CEO.[37]  Accordingly, ODRA concludes that Adsync has not demonstrated that the proposals are sufficiently similar to support its claim of disparate treatment.

- <u>Project Management and Quality Control</u>.  Both the TET and the SSO were impressed by Adacel's reliance on ISO 9001 standards used for project management and quality control.[38]  The TET viewed this as exceeding the requirements in SOW § 3.2.1.  Again, while Adsync makes arguments supporting the strength of its proposal, it does not demonstrate that it offered ISO 9001 processes in its proposal.[39]  More specifically, while Adsync argues that it offered "internationally recognized" standards *like* ISO 9001,[40] its need to compare its offering with Adacel's demonstrates that the two proposals are not sufficiently similar to sustain a disparate treatment charge.

- <u>Continuity of Operations (COOP) Plan</u>.  The TET awarded a strength for Adacel's proposal to provide a COOP plan with multiple safeguards.[41]  Notably, it also granted Adsync a strength for proposing a cloud-based solution for the TSS Web-based Integrated Data Environment (WIDE) to protect data.[42]  But Adsync now claims that the SSO treated it disparately by not treating these strengths equally.[43]  Once again, the proposals are not sufficiently similar to support a disparate treatment charge, but even more importantly, the SSO distinguished between the two. He recognized that Adacel's approach was broader, "including not only technical interruptions, but also other potential impacts such as supply change

---

[35] AR Attach. 13 at 8.

[36] AR Attach. 15 at 4.

[37] Protest at 27; Adsync Comments at 30.

[38] AR Attach. 13 at 7, 8; Attach. 15 at 4.

[39] Protest at 27–28; Adsync Comments at 31.

[40] Protest at 27; Comments at 31.

[41] AR Attach. 13 at 9.

[42] *Id.* at 20.

[43] *See* Protest at 28.

EXHIBIT B

management or personnel resource impacts."[44]  ODRA finds no basis to sustain Adsync's position on this point.

Considering the three findings above, ODRA finds that the adjectival assessment of Volume II was not adversely affected by disparate treatment.

Adsync levels one charge of disparate treatment against the evaluation under Volume III, Factor 1.  This charge pertains to quality management through the offeror's network of vendors in combination with their approach to packaging, handling, shipping, and transportation (PHS&T).[45]  Adsync argues that it also received various strengths for its approach, and therefore, the SSO erred in favoring Adacel.  However, this does not establish a claim of disparate treatment since Adsync is not arguing that similar proposals were treated disparately.  No, this is a matter of the Product Team assessing different proposals and their associated strengths, which led to its subjective conclusion that Adacel provided the better proposal.  Adsync may disagree, but mere disagreement is not a basis to sustain either a protest or a charge of disparate treatment.  Accordingly, ODRA recommends denying the charge of disparate treatment relating to Volume III and, more broadly, to the evaluation as a whole.

### 4.  The TET did not error by finding Adsync deserved *Good* rather than *Excellent* ratings.

The discussion above has rejected Adsync's repetitious attempts to increase the number and quality of the strengths awarded to Adsync for Volumes II and III.  These strengths, of course, are crucial to its argument that it should have earned adjectival ratings of *Excellent* rather than *Good*.  Having rejected Adsync's attempt to increase its strength assessment, ODRA now considers the same unadjusted record as the TET.  Consistent with the standard of review, the fundamental question before ODRA is whether the TET had a rational basis for its adjectival ratings.

The definitions of *Excellent* and *Good* reveal differences in degree.  Placing these criteria side-by-side, sentence-by-sentence underscores the relative differences:

---

[44] AR Attach. 15 at 4.

[45] Protest at 32–33 (citing Protest Ex. K at 10 (debrief)).

EXHIBIT B

**PUBLIC VERSION**

| _Good_ | _Excellent_ |
|---|---|
| The Offeror's response to this solicitation is fully acceptable and appropriately responds to the full range of requirements and work effort. | The Offeror's response to this solicitation <u>is comprehensive and demonstrates the capability to perform</u> the full range of requirements and work effort. |
| Most aspects of the evaluation factors are addressed in a highly competent, substantiated, and logical fashion. | <u>All or almost all</u> aspects of the evaluation factors are addressed in a highly competent, substantiated, and logical fashion. |
| A few minor weaknesses are noted. | <u>Few, if any, areas for improvement can be cited.</u> |
| Proposal demonstrates that performance can be provided at a level that exceeds expectations. | Proposal demonstrates that performance can be provided at a level that <u>substantially</u> exceeds expectations. |
| **The combined impact of the strengths outweighs the combined impact of any weaknesses.** | **The combined impact of strengths <u>far</u> outweighs the combined impact of any weaknesses.[46]** |

In the prior protest, the Product Team's evaluation was not well-documented, forcing ODRA to consider the record of strengths and weaknesses. ODRA could not fathom a rational basis for the assigned ratings, and it demonstrated how, "facially," Adsync's evaluation with far more strengths assigned could have been evaluated as _Excellent_. Now, in the present matter, Adsync latches on to that discussion to argue (1) that ODRA concluded Adsync's proposal merited _Excellent_ ratings and (2) that there is inadequate documentation to award Adsync merely _Good_ ratings.[47]

> ODRA anticipated and inoculated itself from the first argument:

>> To be clear, by merely demonstrating that Adsync could be rated _Excellent_ for this factor, the ODRA does not substitute its judgment for the evaluators' judgment. To be even more clear, the ODRA is not conclusively holding that Adsync deserved an _Excellent_ even if the record could support it. Instead, the demonstration highlights the failure-to-document problem. The record reveals nothing on how the evaluators applied the criteria in reaching their ratings.[48]

Thus, ODRA rejects any explicit or implicit argument that ODRA has already determined that elements of Adsync's proposal justify _Excellent_ ratings. It has not.

---

[46] AR Attach. 1, at M-11, § M.7.1 (underlines added; boldface in the original).

[47] _See, e.g._, Protest at 25, 32, 37–38.

[48] _Protest of Adsync Technologies, Inc._, 23-ODRA-00951 (Findings and Recommendations (Pub. Ver.) slip op. at 21).

ODRA also rejects Adsync's argument that the absence of weaknesses for a factor should automatically yield an *Excellent* rating.[49] That argument depends exclusively on the last sentence of the definitions set forth in the table above. It ignores the other sentences that assess the degree of benefits in absolute terms rather than the degree of benefits relative to the weaknesses. As with any contractual document, ODRA must read and apply the whole text where possible.

Whether Adsync's proposal "exceeds expectations" under the *Good* standard or whether it "substantially exceeds expectations" under the *Excellent* standard are judgment calls vested in the TET. The TET's conclusion does not have to be "right" in absolute terms; it only needs to be rational and well-documented. Unlike the prior evaluation and protest, the record no longer has a vast number of strengths that facially support *Excellent* ratings. Pages 21, 23–24, and 27 of their report adequately document the basis and rationale for rating Adsync as *Good* for exceeding expectations under the factors at issue.[50] Further, unlike the prior evaluation, the TET no longer parrots the criteria for *Good* to document their conclusions.[51] Simply stated, the TET's findings in this reevaluation now meet the required standards. Adsync clearly disagrees, but mere disagreement is not a basis to sustain a protest.[52]

### 5. Conclusion: The Product Team did not err in evaluating Adsync's Volumes II and III.

ODRA has thoroughly considered Adsync's many arguments regarding the evaluation of Volumes II and III of its proposal. It finds no basis to sustain the protest on these grounds.

## B. Price Evaluation

As part of the corrective action in the prior protest, the Administrator allowed Adsync to revise its proposal—including the price volume—but only within strict boundaries to mitigate the OCI violation. The Administrator also required the Product Team to reevaluate Adsync's revised proposal. The remedy, as recommended and adopted, stated in the relevant part:

---

[49] *See, e.g.*, Protest at 37 ("On this basis alone, the Agency would have been left with no other conclusion other than that the combined impact of the (now) one strength that far outweighs the combined impact of any weaknesses, given that there are none.")

[50] AR Attach. 13 at 21, 23–24, 27.

[51] *Id.*

[52] *See, e.g., Protest of US Aviation Group LLC,* 20-ODRA-00881 (Findings and Recommendations (Pub. Ver.) slip op. at 11).

EXHIBIT B

A. Direct the Product Team to establish a reasonable deadline and allow Adsync to revise any aspect(s) of its proposal to address the specific fact that Adacel's updated MaxSim software is the GFE provided under the TRA Contract. In making these revisions, Adsync must:

1. Limit changes to only those due to identification of the GFE software as MaxSim;
2. Identify all text, figures, tables, or other features that it adds;
3. Identify all text, figures, tables, or other features that it deletes; and
4. Place at the front of each proposal volume a table that correlates each change with an explanation of how the change relates to the fact that the GFE software is the updated MaxSim.

B. Require the Product Team to re-evaluate Adsync's revised proposal volumes[.][53]

Following the Administrator's order, Adsync submitted a revised price proposal that decreased its price by $[DELETED] ([DELETED]%) to $[DELETED].[54] As Adacel characterizes the change, Adsync's reduced price was "a tad lower" than Adacel's awarded price of $52,495,797.18. Upon reevaluation of Adsync's revised price, the Price Evaluation Team (PET) accepted all of Adsync's reductions as related to the OCI, except for $[DELETED] associated with [DELETED].[55]

In this protest, Adsync characterizes the refusal to recognize the $[DELETED] portion of the price reduction as an improper price adjustment that conflicts with the AMS Guidance's prohibition on raising prices when performing a price reasonableness analysis.[56] Both the Product Team and Adacel characterize the issue differently. They characterize it as a question of compliance with the Administrator's order, i.e., whether Adsync justifiably reduced its [DELETED] prices when the OCI concerned *software*.[57]

At the outset of this protest, Adsync sought a performance suspension, and ODRA relied on Adsync's characterization of the issue to conclude that Adsync had

---

[53] *Protest of Adsync Technologies, Inc.*, 23-ODRA-00951 (Findings and Recommendations (Pub. Ver.) slip op. at 27).

[54] AR Attach. 6 at PDF page 233; Attach. 14 at Price Evaluation Report Addendum, p. 3.

[55] AR Attach. 14 at Price Evaluation Report Addendum, pp. 8, 15.

[56] Protest at 43 (citing AMS Guidance T3.2.3.A.1.d.3.2).

[57] AR at 31; Adacel Comments at 3.

a strong likelihood of success.[58]  However, ODRA expressly did not rule on the
merits,[59] and the record has developed further since the suspension proceedings.
ODRA accepts the Product Team's basic contention that Adsync was required to
comply with the Administrator's order and that the scope of the evaluation required
the PET to ensure that any changes to the price proposal were well-grounded in the
need to mitigate the OCI.  To rule otherwise would thwart the fundamental AMS
principle that favors competition,[60] thereby allowing Adsync or any similarly
situated, successful protester to exploit its knowledge of an awardee's price.
Moreover, although the Administrator defined the measures required to mitigate
the OCI, AMS Guidance vests primary responsibility for auditing mitigation efforts
in contracting officers.[61]  Thus, ODRA considers whether the CO, who led the PET,
had a rational basis for determining that Adsync's [DELETED] cost reductions were
not related to mitigating the OCI identified in the prior protest.  In this regard,
ODRA considers the contracting officer's actions and the contemporaneous
information available to the PET.

As explained below, ODRA first considers the nature of the reduction.  Next, it
discusses why the PET questioned the reduction and the information considered.
Finally, ODRA finds that the contracting officer, as PET lead, had a rational basis
for rejecting the $[DELETED] portion of the price reduction.

### 1.  The specification defined the significant hardware in detail.

The contract line item numbers (CLINs) at issue are for well-defined
[DELETED].  For                [DELETED]                , the materials are
specified in [DELETED] of the solicitation.  These materials include mundane items
like                [DELETED]         .[62]  More substantial [DELETED] is covered
by              [DELETED]              .  These contain subCLINs specifying
specific models of                        [DELETED]                    .[63]

### 2.  The PET had a rational basis to question the price reduction.

As quoted above, the Administrator obligated Adsync to explain how the changes
in each of its proposal volumes correlate to the revelation that the GFE software
was the updated MaxSim.  For the Price Volume and            [DELETED]        ,
Adsync stated:

---

[58] Decision on Request for a Suspension (Pub. Ver.) at 4.

[59] *Id.*

[60] AMS Policy 3.1.3 (g).

[61] AMS Guidance T3.1.7 A.1.

[62]         [DELETED]         .

[63]         [DELETED]     .

EXHIBIT B

> Previously Adsync received vendor quotes and assigned risk costs associated with integrating unknown GFE with each definable piece of [DELETED]. Now that Adsync understands the MaxSIM is the GFE software, that risk has been removed and the costs are updated accordingly. See Price Volume for updated labor estimations and explanations of relation to MaxSIM as GFE.[64]

After reviewing this explanation and the prices, the CO wrote to Adsync with questions.[65] The CO questioned two inconsistencies. First, he did not understand why risk factors were applied to some                    [DELETED] but not to other items            [DELETED]    . Second, he questioned how specific, contractually defined [DELETED] CLINs could be affected by a software integration risk when the labor for that effort was contained in other CLINs.[66]

The answer he received did not satisfy him or his technical advisor. Adsync referred to                  [DELETED]          that allegedly included a column for risk, with allocations of risk based on                  [DELETED]              .[67] But Adsync did not [DELETED] to the CO either in response to the letter or earlier, with the first version of the price proposal. Moreover, even with the response, the CO and the technical advisor could not reconcile assigning software integration risks to firm fixed prices for clearly defined [DELETED] with detailed specifications.[68] Further, given the inconsistent application of the alleged risk factor, there was no "logical" or "plausible" method supporting the disparate allocation of the alleged risk among the [DELTED].[69] In short, the contracting officer had a rational basis for not believing that the $[DELETED] price reduction for [DELETED] (out of a total reduction of over $6 million) was related to the identification of MaxSim as the GFE software.[70] Accordingly, ODRA recommends denying this aspect of the protest.[71]

---

[64] AR Attach. 6, at PDF p. 226.

[65] AR Attach. 10 at 1.

[66] *Id.*

[67] AR Attach. 11 at 1.

[68] AR Attach. 6 at Addendum p. 15; *id.* at Appendix A, p. 4.

[69] *Id.* at Appendix A, p. 4.

[70] Had the Product Team ignored its own evaluation and awarded a contract to Adsync based on its full price reduction of 10.99%, Adacel would have had grounds for its own protest. In these unique circumstances, ODRA will not fault the Product Team for rendering its best value decision based on an adjustment to Adysnc's revised price.

[71] ODRA has considered the materials provided by Adsync,          [DELTED]         and a supporting declaration. However, these were not before the CO at the time of the evaluation and, therefore, are of little value regarding whether the determination had a rational basis. Further,

## C. The SSO's Award Decision and the Best Value Trade-Off

Adsync also challenges the SSO's best value determination and award decision. Adsync repeats many of the same issues addressed above regarding the TET's evaluation, but the results do not change, and ODRA perceives no benefit to repeating its analysis. ODRA addresses, however, allegations of unstated evaluation criteria and improper consideration of past performance ratings.

### 1. The Product Team did not use unstated evaluation criteria.

ODRA has explained that "awards must be based on the stated evaluation criteria" as required by the AMS and precedent.[72] The rule is tempered by the countervailing principle that "when performing the evaluation, however, the 'agency may take into account specific, albeit not expressly identified matters that are logically encompassed by the stated criteria.'"[73] Similarly, unlike evaluators in a "technically acceptable/low price procurement" competition, evaluators in a "best value" competition will have a rational basis to favor an offeror that has shown its qualifications exceed the minimal requirements of the solicitation.[74] This last principle is of particular importance in this protest.

The solicitation established that the basis for award in this competition was "best value."[75] Moreover, by definition, a *strength* applies to an "element of an Offeror's proposal which exceeds requirements …."[76] Thus, ODRA holds that the Product Team, including the SSO, was permitted to give Adacel credit for added benefits within the definition of *Strength* so long as it had a rational basis for the conclusion. Additionally, ODRA also finds that the issues addressed are logically encompassed by specific requirements:

---

Adacel charges that Adsync provided a copy of its proposal that was materially different from what it actually submitted for re-evaluation. Adacel Comments at 3, n.1. Adacel moves to strike. Adsync has not responded, but given the outcome of these Findings and Recommendations, ODRA finds no prejudice in treating the motion as moot.

[72] *Protest of Apptis, Inc.,* 10-ODRA-00535 (Findings and Recommendations (Pub. Ver.) slip op. at 76) (citing AMS Policy 3.2.2.3.1.2.3; *Protest of Evolver, Inc.,* 10-ODRA-00523).

[73] *Id.* at 76 (quoting *Protest of Northrup Grumman Systems Corporation*, 06-ODRA-00384).

[74] *Protest of DMS Technologies*, 04-ODRA-00306 (Findings and Recommendations (Pub. Ver.) slip op. at 15). Intervenor Adacel addresses this same issue, just from the opposite point of view. It notes that "protesters typically raise unstated evaluation criteria arguments to challenge the assignment of weaknesses—not for discriminators or strengths the SSO credits the awardee." Adacel Comments at 12 (citing *Protest of Systems Atlanta, Inc.,* 10-ODRA-00530). Adacel says Adsync is "flipping the unstated evaluation line of cases on its head." Adacel Comments at 12.

[75] AR Attach. 1, at M-2, § M.4.

[76] *Id.* at M-13, § M.7.3.

EXHIBIT B

- Adsync challenges the SSO's view that Adacel's communication approach offered a benefit beyond solicitation requirements, but this strength is related to requirements to address communications found in §§ L.11.2.2.1 and M.6.1.1.2.[77]

- Adsync also challenges benefits accruing from Adacel's continuity of operations plans (COOP), but this consideration is directly related to the requirement to address and evaluate COOP stated in §§ L.11.2.2.1 and M6.1.1.1.[78]

- Finally, Adsync challenged the SSO's view that Adsync's quality management system aligned well with the FAA's current best practices regarding "packaging, handling, shipping, and transportation (PHS&T) processes," but this relates to several aspects of the solicitation, including § L.11.3.1 (TSS Tech Refresh for storage and shipping) and § M.6.2.1 (Tech Refresh).[79]

Accordingly, Adsync has not shown the improper use of unstated evaluation criteria, and ODRA recommends denying this aspect of the protest in its entirety.

## 2. The trade-off considered past performance appropriately.

Volume IV, Past Technical Performance, was not reevaluated as part of the remedy in the prior protest. Thus, the initial ratings remained unchanged. Adsync received the highest rating of *Substantial Confidence*, and Adacel earned *Satisfactory Confidence*.[80] Adsync charges that the SSO failed to adequately consider its past performance advantage when rendering the best value decision.[81]

ODRA disagrees. While the SSO acknowledged Adsync's higher rating, he correctly observed that both ratings anticipate the ability to perform the contract successfully.[82] Further, the SSO recognized that Volume IV is the least important volume, certainly less important than the price.[83] ODRA finds no fault in his analysis because the evaluated prices favored Adacel.

---

[77] *Id.* at pp. L-14, M-5.

[78] *Id.*

[79] *Id.* at pp. L-17, M-6.

[80] AR Attach. 12.

[81] Protest at 59–61.

[82] AR Attach. 15 at 5.

[83] *Id.*; AR Attach. 1, at M-3, § M.5.4.

### 3.  A rational bass supports the best value trade-off determination.

ODRA finds that a rational basis supports the best value determination and is sufficiently documented.  Accordingly, it recommends denying this aspect of the protest.

## D. The alleged violations of the prior order are moot or not supported.

Adsync charges that the new SSO had participated in the prior acquisition, thereby violating the Administrator's order to appoint a new SSO with no previous involvement in the acquisition.[84]  The SSO's declaration demonstrates that he did not have prior involvement in the acquisition,[85] so this protest ground should be denied.

Adsync also charges that the Product Team should not have reevaluated Adacel's proposal since Adacel was not given the opportunity to revise it.[86]  The order, however, required the TET to render new findings for Volumes II and III consistent with the solicitation and the Findings and Recommendations.[87]  Further, it required a new award decision to follow the same authorities.[88]  Lastly, beyond the foregoing support in the order, the fact that a new team of evaluators was assembled supports the notion that the same individuals should evaluate proposals for the sake of consistency.  Thus, there is no basis to challenge the reassessment of Adacel's proposal.

Finally, Adsync charges that the Product Team violated the Administrator's order in the prior protest by adding funding to Adacel's contract during the reevaluation period.[89]  It relies on the portion of the remedy that prohibited the Product Team from issuing new orders or exercising options. Despite the remedy's evident purpose of preserving the *status quo* during the reevaluation process, the Product Team defends its actions by demonstrating that it only added incremental funding to existing orders.[90]

ODRA does not address this issue.  Given the recommended denial of all other aspects of this protest, Adsync cannot show injury for this final issue, and ODRA recommends it be denied as moot.

---

[84] Protest at 16.

[85] AR Attach. 26 at 2, ¶ 8.

[86] Protest at 15–16.

[87] *Protest of Adsync Technologies, Inc.*, 23-ODRA-00951 (Findings and Recommendations (Pub. Ver.) slip op. at 27)

[88] *Id.*

[89] Protest at 13–15.

[90] AR at 10–11.

EXHIBIT B

## IV. CONCLUSION

Based on the foregoing discussion, ODRA recommends denying the protest in its entirety.

—S—

_____
John A. Dietrich
Director[91] and Chief Administrative Judge

---

[91] The Director is also a Dispute Resolution Officer under the regulation.  14 CFR § 17.3(l) (2025).

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of June, 2025, a true and accurate copy of the foregoing Petition for Review was sent to the persons listed below pursuant to Federal Rule of Appellate Procedure 15(c), D.C. Cir. Rule 15, and 14 C.F.R. § 17.43:

<u>Via Electronic Mail to:</u>

Office of Dispute Resolution for Acquisition
800 Independence Ave. SW
Washington, D.C. 20591
Telephone: 202-267-3290
Facsimile: 202-267-3720
*9-AGC-ODRA@faa.gov*

Adacel Systems, Inc.
c/o Counsel:
Noah B. Bleicher, Esq.
JENNER & BLOCK LLP
1099 New York Ave. NW
Suite 900
Washington, D.C. 20001
Telephone: 202-639-6000
*nbleicher@jenner.com*

<u>Via Facsimile to:</u>

William "Liam" McKenna
Chief Counsel
Federal Aviation Administration
800 Independence Ave. SW
Washington, D.C. 20591
Telephone: 202-267-3222
Facsimile: 202-267-3227

<u>/s/ Paul A. Allulis</u>
Paul A. Allulis
